BOARD OF EDUCATION, Respondent, v. SINCLAIR, Appellant.

*No. 268. Submitted September 9, 1974.—Decided October 14, 1974.*
(Also reported in 222 N. W. 2d 143.)

[55] *Daar, supra,* footnote 49, at page 715.

180

181

For the appellant there was a brief by *Ebbeson & Jonjak* and *Paul L. Jonjak,* all of Sturgeon Bay.

For the respondent there was a brief by *J. D. McKay* of Green Bay.

DAY, J. We conclude that public schools may sell or charge fees for the use of books and items of a similar nature when authorized by statute without violating art. X, sec. 3 of the Wisconsin Constitution.

We are persuaded that when the framers of our constitution used the phrase "free and without charge for tuition to all children . . . ," the word "free" meant without cost for physical facilities and equipment; "without charge for tuition" meant there should be no fee charged for instruction;[2] and "to all children . . ." meant such schools were equally available to all children within the district.

In reaching the conclusion that "free" as used in art. X, sec. 3, Wisconsin Constitution, means "without cost," we look first to the plain meaning of the word in the context in which it is used. "The legislature shall provide . . . for . . . district schools, . . . and such schools shall be free and without charge for tuition to all children . . . ." Webster's, *New International Dictionary* (3d ed., unabridged), p. 905, 9a, defines "free" as: ". . . not costing or charging anything [a free school] . . . b: given or furnished without cost or payment . . . admitted without payment . . . ." However, with the addition of the words "and without charge for tuition" there is a logical restriction on the scope of the word "free."

We conclude that "free" referred to the school building and equipment. We arrive at this conclusion from an historical analysis of what practices were in existence in

[2] Webster's, *New International Dictionary* (3d ed., unabridged), p. 2461, defines "tuition" as ". . . the price of or payment for instruction . . . ."

1848 which we may reasonably presume were also known to the framers of the 1848 constitution. In *State ex rel. Comstock v. Joint School District* (1886), 65 Wis. 631, 636, 27 N. W. 829, this court said:

". . . the school district system was in full operation in the territory when the constitution was framed and adopted, it is clear that section 3 of article X is a recognition of that system, and a mandate to the legislature to preserve and continue its essential features."

In some places in the Wisconsin territory, it was not unusual for the community to furnish the building in which the school was conducted but then leave it up to the teacher to charge a tuition to each pupil to cover his salary. In *Public Education in Wisconsin* by Conrad E. Patzer published by the state superintendent of public instruction (1924), the author states, page 5: "Any community desiring a school could build one and engage a teacher, the expense of building and cost of maintenance being provided by private contributions. Sometimes a community built a school house and allowed the teacher to conduct a private school in it . . . . In such cases the teacher became responsible for collecting the money for his salary," and again at page 9, "The so-called public schools, as they developed under the laws of 1839, 1840, 1841 and 1843, were not free public schools. The money needed for the maintenance of the schools came partly from taxes levied by the district, partly from the per capita tax, and partly from collections made by the public school teachers themselves."

Thus it is reasonable to conclude that the framers of art. X, sec. 3 of the constitution, being familiar with the system of treating school buildings and equipment as one cost paid in one way and costs for instruction as a separate charge, intended that, first, there should be no charge to pupils for the use of the school building, its

maintenance or the equipment therein; and second, that there would be no charge for the teacher's instruction. "To discover that intent reference may be had . . . to the history of the times, the state of society at the time . . . the constitution was framed and adopted, and to prior well-known practices and usages. . . ." *State ex rel. Zimmerman v. Dammann* (1930), 201 Wis. 84, 89, 228 N. W. 593.

We turn next to the earliest interpretation of this section of the constitution by the legislature as manifested in the first law passed following the adoption of the constitution. Ch. 19, Revised Statutes 1849, provides:

*"District Meetings* . . . Sec. 11. The inhabitants qualified by law to vote at a school district meeting, when assembled at the first meeting in their district, or when lawfully assembled at any other district meeting shall have power, . . .

"5. To vote such tax on the taxable property of the district as the meeting shall deem sufficient to purchase or lease a suitable site for a school house, and to build, hire or purchase such school house, and to keep in repair and furnish the same with the necessary fuel and appendages;

"6. To vote a tax on the taxable property of the district of such sum as the meeting shall deem proper for the pay of teachers' wages in the district;

". . .

"9. To vote a tax not exceeding twenty dollars in any one year, for the purchase of globes, black-boards, outline maps, or any other apparatus for illustrating the principles of agriculture, chemistry, or the mechanic arts; . . ."

Sec. 28 thereof, page 193, provided, in part: "The district board shall provide the necessary appendages for the school house, and keep the same in good condition and repair, during the time a school shall be taught therein; . . ." The legislature made these grants of power to tax so that the school districts could carry out the constitu-

tional mandate to provide school houses, keep them in repair and provide equipment and pay teachers. All this was to be done at no cost to the individual pupil.

As this court said in *State ex rel. Pluntz v. Johnson* (1922), 176 Wis. 107, 114, 115, 184 N. W. 683, 186 N. W. 729, in reference to the right of certain county officers to hold over their terms until their successors shall be qualified:

". . . evidence that such was the purpose of the framers of the constitution appears by the fact that sec. 59.12 of the Statutes, which provides that the county officers shall hold their offices until their successors qualify, first appeared in the statutes of this state as sec. 141 of ch. 10 of the Revised Statutes of 1849. This amounts to contemporaneous legislative construction of this constitutional provision, which construction is entitled to great deference."

*See also Payne v. Racine* (1935), 217 Wis. 550, 558, 259 N. W. 437.

At the time the Wisconsin Constitution was adopted, it was not the custom for school districts to furnish free textbooks to pupils. *The Founding of Public Education In Wisconsin* (1956), Lloyd P. Jorgenson, p. 140, published by State Historical Society of Wisconsin. The only authority to purchase books given in 1849 was for indigent pupils and for school district libraries. Ch. 19, sec. 38, Revised Stats. 1849, provided:

"Sec. 38. The district board may purchase, at the expense of the district, when families or guardians may not be able to furnish the same, such school books as in their judgment may be necessary for the use of any children attending school in their district, and they may include the amount of such purchase in any tax list to be collected in such district."

Sec. 83 provided:

"Sec. 83. So soon as the total annual income of the school fund of this state shall amount to a sum equal to or exceeding the sum of thirty thousand dollars, it shall be

the duty of the superintendents of the several towns to appropriate and distribute annually ten per cent of all moneys received by their respective towns, to the several districts in such towns, to be applied by such districts to the purchase of school district libraries, which shall be the property of such districts, and the parents and guardians of all the children therein between the ages of four and twenty years, shall be permitted to use books from such library without charge, being responsible to the district for the safe return thereof, and for any injury done thereto, according to such rules and regulations as may be established by the state superintendent."

The board in each school district had authority to designate the texts to be used by the pupils. Ch. 19, sec. 39, Revised Stats. 1849, provided:

"Sec. 39. The board in each school district shall have power, under the advice of the superintendent of public instruction, to determine what school and text books shall be used in the several branches taught in the school of such district."

In spite of the fact that the board designated what textbooks a pupil must use, provision was made only to furnish books to indigents. There was no provision for furnishing pencils or writing materials to pupils. Then, as now, it was usually up to the pupil to furnish such items for himself. *State ex rel. Smith v. Board of Education of the City of Eau Claire* (1897), 96 Wis. 95, 71 N. W. 123.

In *Hamer v. Board of Education* (1970), 47 Ill. 2d 480, 483, 265 N. E. 2d 616, 618, the Illinois Supreme Court construed art. VIII, sec. 1 of their constitution which provided:

" 'The general assembly shall provide a thorough and efficient system of free schools, whereby all children of this state may receive a good common school education.' "

In analyzing the history of the school system, which the court stated the constitution was designed to perpetuate, the Illinois court said:

"Our examination of the contemporary statutes, writings and well-known practices convinces us that the popular and natural meaning of the term "free schools" at the time the constitution was adopted by the constitutional convention and ratified by the voters did not include furnishing textbooks to the students at public expense." (p. 489), 265 N. E. 2d at 621.

We agree with the reasoning in the *Hamer Case* and conclude that under secs. 118.03 (1) (b), 120.10 (15), and 120.49 (7) (a), (b), Stats., the sale or rental of textbooks to pupils does not violate art. X, sec. 3 of the Wisconsin Constitution. Wisconsin statutes require that textbooks be furnished free to indigents (secs. 119.16 (5), 120.12 (11)). It follows that items similar to textbooks, such as workbooks, may be sold or rented by the schools or the pupils may be required to furnish the same.

If a course is credited toward graduation, even though not a required course in the curriculum, it comes within the purview of the constitutional requirement that fees, other than for books or similar items, may not be charged.

We have stated that pencils, pens, notebooks and paper customarily furnished by pupils for their own use in pursuing a course are not within the "free" provisions of art. X, sec. 3 of our constitution. We conclude that similar items, not specifically contemplated in 1848 but of the same nature, in the sense of being individually used, need not be furnished free; such items as gym suits and towels, and band instruments would be in this category, and if rented, such rental must be reasonable and tied to cost. On the other hand, electronic listening devices, microfilm readers and similar devices, used by individual pupils are comparable in nature to the "apparatus" described in sec. 11, subparagraph 9, of ch. 19, Revised Stats. 1849, cited *supra*, which the school must furnish without charge to the individual pupil.

In the case at bar, there is nothing in the record to show what the "incidental educational supplies," re-

ferred to in the trial judge's opinion, were for which a charge was made. If the charge is for a permissible purpose authorized by statute and reasonable in amount, it may stand; if it falls outside that limited area for which charges are permissible, it must fail. A finding and determination by the trial court is required.

Counsel for appellant William Sinclair has cited three cases interpreting state constitutions which conclude that no rental charge may be made for textbooks; that pupils cannot be required to furnish such books; and that books must be furnished free. In *Paulson v. Minidoka County School District No. 331* (1970), 93 Idaho 469, 463 Pac. 2d 935, the constitution provided: ". . . general, uniform and thorough system of public, free common schools." There is no reference to what the practice was as to furnishing textbooks at the time the Idaho Constitution was adopted. We do, however, agree with that court when it said:

". . . because social and extra-curricular activities are not necessary elements of a high school career, the constitution does not prohibit appellants from setting fees to cover costs of such activities to be paid by students who wish to exercise an option to participate in them." (p. 472), 463 Pac. 2d at 938.

In *Bond v. Ann Arbor School District* (1970), 383 Mich. 693, 178 N. W. 2d 484, the constitution provided: ". . . a system of free public elementary and secondary schools . . . ." There was no reference in the case as to what the practice was at the time the Michigan Constitution was adopted. In *Granger v. Cascade County School District* (1972), 159 Mont. 516, 520, 499 Pac. 2d 780, 782, the constitutional provision involved was: " '. . . general, uniform and thorough system of public, free, common schools.' " This case did not discuss what the practice was with respect to furnishing textbooks at the time the constitution was adopted and hence, along with *Paulson* and *Bond,* is not persuasive on that point. How-

ever, the *Granger Case* made it clear that "reasonable fees and charges may be imposed" for courses or activity for which no credits toward graduation are given.

We disagree with the conclusion reached in 57 Op. Atty. Gen. (1968), 45, 49, relied on by the board, that "free" as used in art. X, sec. 3, Wisconsin Constitution, means " 'open to all' " rather than " 'without cost.' " The attorney general concludes that art. X, sec. 3, "does not prevent imposing reasonable fees or charges for such expenses not included within the definition of tuition . . ." if authorized by statute, 57 Op. Atty. Gen. at 51. The attorney general defines "tuition" as "a charge for instruction and does not include a construction assessment, the rental or use of a building, cost of fuel or light, janitor's salary or other incidental expenses," and concludes that with legislative sanction, fees and charges could be levied for these items. We disagree. The enumerated items are of the kind the 1849 legislature authorized school districts to levy taxes to pay for as included within that part of the cost of education that was to be "free," 57 Op. Atty. Gen. at 51.

The order appealed from is affirmed as to textbook rental, and the cause is remanded for determination as to what is included in "incidental fees."

*By the Court.*—Order affirmed, in part; and cause remanded for further proceedings not inconsistent with the opinion.